METROPOLITAN TRUST CO. v. COLUMBUS, S. & H. RY. CO.

(Circuit Court, S. D. Ohio, E. D. June 21, 1899.)

1. RAILROAD LEASE—VIOLATION OF CONDITION—WAIVER BY ACQUIESCENCE.

A railroad company leased to another company the right to use a portion of its road as a part of the lessee's main track for 99 years, renewable forever; the lease providing that the lessee should not extend its road into certain coal territory, or receive coal for transportation from any connecting line, and that in case of violation of such conditions the lease should not terminate, or the payment of rental cease, but the right of the lessee to use the track demised should be suspended during the continuance of the violation. The successor in interest of the lessee acquired by purchase, as permitted by law, certain connecting lines extending into the prohibited territory, which it operated in connection with its original road for nine years, without objection on the part of the lessor. Held that, conceding the provision against extension to have been valid, it was waived by the lessor by such long acquiescence, and with it the right to object to the transportation by the lessee of coal received for shipment on its purchased lines, which was not prohibited by the lease, except incidentally, by the provision against extension.

2. SAME—VOID CONDITION SUBSEQUENT.

The provision of the lease against the receiving of coal for transportation by the lessee from connecting roads imposed upon the lessee a condition subsequent, which was void as against public policy, being one which the lessee could not perform without a violation of its legal duty as a common carrier; and the lessee took the grant freed from such condition, and from any right in the lessor to enforce the penalty for its violation.

3. SAME—INTERFERENCE WITH RECEIVER'S USE OF LEASED ROAD—INJUNCTION.

The right of a receiver of the court operating a railroad to the joint use, as a part of the main line of such road, of a portion of the track of another company which the insolvent company is given the right to use by a valid lease, will be protected by injunction.

Petition of Samuel M. Felton, receiver of the defendant railroad company, against the Toledo & Ohio Central Railway Company. On motion for preliminary injunction.

This is a railroad foreclosure suit. Samuel M. Felton, as receiver, is engaged in operating the railroad of the defendant, the Columbus, Sandusky & Hocking Railroad Company, under orders of this court. He now files an intervening petition against the Toledo & Ohio Central Railway Company. He avers that 24 miles of the main track of the Columbus, Sandusky & Hocking Railroad Company, extending from Alum Creek Junction, near Columbus, Ohio, to Hadley Junction, at Thurston, is held under a lease from the Toledo & Ohio Central Railway Company made to the Columbus & Eastern Railroad Company on or about August 24, 1895, with the Columbus & Eastern Railroad Company; that the latter company duly entered upon the demised premises, and used and enjoyed the same from 1885 until 1889, when all of its railroad and property, including the leasehold estate, was sold under foreclosure and conveyed to the Columbus, Shawnee & Hocking Railroad Company; that this company entered upon the demised premises, and continued to use and enjoy the same until its consolidation with the Columbus & Sandusky Short-Line Railway Company into the Columbus, Sandusky & Hocking Railway Company; that the latter company entered upon the demised premises and enjoyed the leasehold estate until the same were sold under foreclosure in 1895 to the Columbus, Sandusky & Hocking Railroad Company, the defendant in this foreclosure suit; that the petitioner has been in possession of the demised premises since his appointment as receiver; that the premises are a part of the main line of the defendant's railroad, and that without them the petitioner cannot operate the railroad, or discharge his duties as a common carrier; that the petitioner has paid the rentals and other charges provided in the lease, and that the Toledo & Ohio Central

Railway Company, without lawful ground or excuse, has notified the petitioner that it will prevent him from operating said portion (the 24 miles above described) after June 1, 1899; that inasmuch as the movements of all trains by telegraph while on said portion of said railroad are by the terms of the lease subject to the order of the manager of said Toledo & Ohio Central Railway Company, and under the control of his superintendent, it will be impossible for the petitioner to use and enjoy that portion of said railroad without danger to life and property, if said Toledo & Ohio Central Railway Company carries out the threat in said notice. The petitioner prays that the lessor company be enjoined from interfering with petitioner's enjoyment and use of the demised premises. The Toledo & Ohio Central Railroad Company files an answer to this petition, and the issue which is raised upon the answer will be best understood after a description of the lease. By item 1 of the lease, the party of the first part, the Toledo & Ohio Central Railroad Company, in consideration of the obligations stipulated to be performed in the lease by the party of the second part, the Columbus & Eastern Railroad Company, and the terms and conditions thereof, "does hereby grant, demise, and lease for the period of ninety-nine years from Dec. 1st, 1885, and renewable forever upon like terms and conditions, the right to use in common with the first party that part of the Toledo & Ohio Central Ry. known as the 'Columbus Branch,' and extending from Hadley Junction, on the main line of the Toledo & Ohio Central Ry., to Alum Creek Junction, near Columbus, in Franklin county, Ohio, together with the joint use of the main and side tracks, switches, connecting tracks, depots, and other station buildings and structures of every kind which are now in use, or which may hereafter be acquired for use, in connection with the portion of railway hereby leased." By item 2, the second party agrees to pay an annual rental of $12,000, in quarterly installments of $3,000 each. By item 3, the second party agrees to pay a proportionate part of the expenses incident to the movement of trains, and the maintenance and perpetuation of the railroad, including all taxes and assessments based upon car and engine mileage. Item 9 provides that, in the movement of trains over the portion of railway demised under the lease, trains belonging to each party shall have equal privileges with the trains of the same class belonging to the other parties; that the superintendents of the respective parties shall arrange the time schedules for all such trains, and the movements of all trains by telegraph while on such portion of such railroad shall be subject to the general manager of the first party, under the control of his superintendent. Item 10 provides that the second party shall do no local business, either passenger or freight, which belongs exclusively to the line of road thereby demised, but all such business and the income therefrom shall belong to the first party. But nothing in the lease is to prevent the second party from doing business on the demised lines to or from the stations beyond the line leased. Item 12 provides that, if the first party shall fail to maintain the railroad in good condition, the second party shall request it to make the necessary repairs, and, if it fails to do so, then the second party may make such repairs, and deduct the expense thereof from the rent. Item 13 forbids the second party to sublet any portion of the premises demised, or grant to third parties the right to use the same, without the written consent of the party of the first part. Item 16, upon which this controversy chiefly arises, is as follows: "It is hereby expressly agreed, understood, and made an essential condition of this contract, that the lessee herein shall not extend its line southwestwardly or southwardly into what is now known as the 'Coal Territory' occupied by the T. & O. C., the B. & O., and the C., H. V. & T. Railroads, or either of them, nor to receive coal for transportation from any other lines. The lessee's line in no event to extend in Perry county, Ohio, south of an imaginary line drawn east and west across the north end of what is known as the 'Moxahala Tunnel,' on the road of the lessor herein. The lessor herein retains, and it is hereby agreed it shall have, the right to suspend the operations of this lease at any time the lessee may violate the aforesaid provision; and such suspension shall at the option of the lessor, continue until satisfactory assurances are given and made that there will be no further violation of said provision on the part of the lessee. The lessee's rental shall continue in full force, and payment must be made during any such suspension as if such suspension has not occurred." Item 17 is as follows: "The lessor herein agrees with the lessee that it will carry any business which the lessee may turn over to it upon

a basis of prorating, in accordance with the usual and customary rules governing such business between railroad companies."

After the Columbus & Eastern road became the property of the Columbus, Shawnee & Hocking Railway Company, the latter company acquired an interest in a railroad lying to the south of the imaginary line described in the sixteenth article of this lease, and in the prohibited territory. The Toledo & Ohio Central Railway Company wished to acquire an interest in this line thus controlled by the Columbus, Shawnee & Hocking Railroad Company, and by agreement of lease made on the 1st day of May, 1890, between the Columbus, Shawnee & Hocking, of the first part, and the Toledo & Ohio Central, of the second part, provision was made for the joint operation of certain parts of the line by the two companies. It is stipulated therein that either of said parties may connect with the said leased road any branch or branches that may be built by shippers or miners of coal or others, or by either of said first or second parties, to reach coal mines or other business in the undeveloped districts adjacent to said leased railroad. This railroad formed an extension of the line of the Columbus & Eastern Railroad, of which the Columbus, Shawnee & Hocking was then known by the Toledo & Ohio Central Railway Company to be the owner; and it lay almost wholly within the prohibited district described in item 16 of the lease here in controversy, and it had but little value, except as a coal road for that territory. For nine years since 1890, the Columbus, Shawnee & Hocking road and its successors in title have been engaged in operating this Buckingham Branch in common with the Toledo & Ohio Central Railroad Company, and no objection has ever been made by the latter to this branch as an extension of the line of the Columbus & Eastern road. During that time 90 per cent. of the coal hauled by the Columbus, Sandusky & Hocking Railroad has come from the Congo mine, which lies south of the imaginary line referred to in item 16. From time to time the Toledo & Ohio Central road has entered its written protests against the hauling of such coal over the Columbus Branch, herein in controversy, but it has never taken any proceedings other than as above recited. It now appears that the receiver is receiving for transportation over the railroad operated by him from what is known as the "Sunday Creek Coal Mine," or "Mine No. 21,"—a mine also below the imaginary line of the inhibited territory. This is admitted to. be the case by the receiver. On account of this the receiver of the Columbus, Sandusky & Hocking road has been notified by the general manager of the Toledo & Ohio Central that, unless it ceases to carry coal below the imaginary line in Perry county over its track, its use of the 24 miles leased from Alum Creek to Hadley Junction will be suspended by the Toledo & Ohio Central Railway Company.

Lawrence Maxwell, Jr., for receiver.
Doyle & Lewis, for Toledo & O. Cent. Ry. Co.

TAFT, Circuit Judge. Item 16 of the lease purports to bind the lessee, as a condition of enjoying the estate conveyed to it by the lease, that it shall never extend its line into territory lying just beyond its then terminus. Item 16 does not forfeit the estate. That continues, but the effect of the clause is that, if the lessee shall extend its lines into the forbidden territory, then forever after it shall pay $12,000 a year, without the right to enjoy the estate with which it is vested by the lease. Railroad companies, by the statutes of Ohio (sections 3300 and 3306), are given the power to extend their lines, either by their own construction, or by the purchase or lease of other lines. These provisions are for the benefit of the public, and it may admit of serious doubt whether a railway company may, consistently with public policy, disable itself from exercising such powers forever. Hartford & N. H. R. Co. v. New York & N. H. R., 3 Rob. (N. Y.) 411; Railroad Co. v. Ryan, 11 Kan. 602; Marsh v. Railway Co., 64 Ill. 414; Railroad Co. v. Mathers, 71 Ill. 592; Rail-

way Co. v. Marshall, 136 U. S. 393, 401, 402, 10 Sup. Ct. 846; Woodstock Iron Co. v. Richmond & D. Extension Co., 129 U. S. 643, 656, 9 Sup. Ct. 402.    However this may be, the subsequent agreement of lease between the Columbus, Shawnee & Hocking Railroad Company and the Toledo & Ohio Central Railway certainly abrogated clause 16, in so far as that forbade an extension of the line of the Columbus & Eastern Railroad.    The second lease was an express recognition of the right of the successor in title of the Columbus & Eastern Company to operate an extension into the forbidden territory; and the Toledo & Ohio Central Railway Company has enjoyed occupancy under this second lease, and rent under the first lease, for nine years, and is still enjoying them, without ever having objected to the extension.    It is too late for it now to insist upon the condition as it appears in the first lease.    But it is contended that, even if it may have waived the right to object to the extension, it has never waived the right, but it has continually asserted it by written communication, to object to the use of the Columbus Branch for the transportation of coal from the forbidden territory; and this, it is said, was the purpose of the whole condition.    Nor, it is said, has it ever waived its right to object to the lessee's or its successor's receiving coal from any other lines.    It is asserted that its waiver of some of the conditions of item 16 does not prevent its enforcement of the remainder. In item 16 there is no inhibition of the right of the lessee company to haul coal from the inhibited territory over the demised line.    Its inability to do so under the lease was merely the resultant effect of the condition that it should not extend its line into the territory, and should not receive coal from other lines.    The permission to extend the line into the territory theretofore forbidden simply made this effect no longer a necessary one.    The lessor company could not waive the right to extend the line, and still hope to insist that no coal should be carried thereon from the forbidden territory over the Columbus Branch, when there was no such prohibition in the contract of lease distinct from the stipulation against the extension of the line.    The waiver destroyed, not only the obligation in reference to extension, but also all the consequences upon which the lessor had relied as flowing therefrom.    It is well settled that, if the condition in a lease is single, it is wholly discharged by waiver.    Taylor, Landl. & Ten. § 501.    Nor is the restriction upon the right of the lessee company to receive coal limited to that mined in the forbidden territory for transportation over the Columbus Branch.    It applies to the receiving of all coal, wherever mined, from connecting lines, to be transported over any part of the lessee's line.    It, in effect, limits its transportation of coal to that mined on its own unextended line.    Clearly, such a disabling of the lessee to perform its duties as a common carrier is in violation of public policy and is void.

But, even if the condition can be pared down to the form in which the lessor would now enforce it, what would the case be?    The lessor would have leased to a railroad company having a line extending into the southern portion of Perry county 24 miles of railroad, to be used as part of the main track of the lessee company for 99 years, the term to be renewable forever, and would have imposed upon the

lessee's enjoyment of the estate a condition subsequent that it should not receive from shippers or connecting lines coal mined in the forbidden territory, to be transported over the demised 24 miles of railroad. Now, it would clearly be the duty of the lessee company to receive, in the territory into which its line extended, all coal tendered to it for transportation, either by shippers or connecting lines, wherever mined, and to transport it over its own line to the place of destination. The leased 24 miles would be a part of its line, and it would have no more power to decline to discharge its public duties with respect to that portion of its line than it would have with respect to that which it owned in fee. Any stipulation by which it should bind itself not to discharge its public duties as a common carrier would be void. Peoria & R. I. Ry. Co. v. Coal Valley Min. Co., 68 Ill. 489; Gibbs v. Gas Co., 130 U. S. 396, 410, 9 Sup. Ct. 553; and cases cited. Nor, as contended by counsel, would the fact that the lessee company might turn such coal over to the lessor company before the Columbus Branch was reached, and prorate the freight, under the seventeenth item of the lease, prevent this stipulation from being illegal and void. A shipper may demand from a common carrier that it carry the merchandise from the receiving point to the terminus of its line over its own road, because it is under an obligation to render the same duties as to all parts of its road to the public. It may be again remarked, as relevant to this contention, that the condition as to receiving coal is not limited to a restriction upon carrying coal over the demised premises, but inhibits the carrying of coal thus received on any part of the line.

But, it is asked, cannot the lessor limit the use of its own property as it chooses? It is under no obligation to lease its railroad to another railroad company at all; but, if it does so, then it can only impose upon its use by the lessee such restrictions as are consistent with the discharge by the lessee of those duties which, as a common carrier, the lessee owes to the public. Restrictions in the nature of conditions subsequent, which, in respect to the demised premises, forbid the lessee to do its public duties as a common carrier, would, if enforced, prevent the lessee from enjoying the demised premises at all in a lawful manner, and are therefore repugnant to the grant and void. When one takes an estate upon condition subsequent, which is void as against public policy, or for any other reason, the estate continues in the grantee or lessee, freed from the condition. Co. Litt. 206a; Railroad Co. v. Mathers, 71 Ill. 592; 1 Story, Eq. Jur. § 288; 2 Washb. Real Prop. (5th Ed.) 8.

A similar question was presented in the cases of Missouri v. Bell Tel. Co., 23 Fed. 539 (a decision by Mr. Justice Brewer while Circuit Judge); State v. Delaware & A. Telegraph & Telephone Co., 47 Fed. 633; and Delaware & A. Telegraph & Telephone Co. v. State, 3 U. S. App. 30, 2 C. C. A. 1, and 50 Fed. 677. The patentees of a telephone had licensed telephone companies to use their patents for the purpose of operating public telephone lines within a given district, but prohibited such companies from serving within such district any telegraph company. The court, in each of the cases cited, by mandamus, compelled the extension of service to any one within the district de-

manding connection and paying established charges. The limitation upon the license was held to be void on the ground that a public telephone company was a common carrier, and as such was charged with the duty of dealing equally with all, and discriminating against none, tendering equal pay for equal service. These cases were considered by the court of appeals of this circuit in the case of the Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 47 U. S. App. 146, 25 C. C. A. 267, and 77 Fed. 288. Judge Lurton, speaking for the court, after stating the cases and the ground for the decision said:

"The conclusion to be drawn from these telephone cases is this: That, when a patentee authorizes the use of his invention by one charged with public duties and subject to regulation by law, it is not competent by a restriction on the use to deprive the licensee of the power of rendering an equal service to all who apply and tender the compensation fixed by law or regulation for the same service to others. The patentees were under no obligation to license the use of their inventions by any public telephone company. Having done so, however, they were not at liberty to place restraints upon such a public corporation which would disable it from the discharge of all the duties subject to regulation by law. It could not be a public telephone company, and could not exercise the franchise of a common carrier of messages, with such exception in the grant. The exception, being repugnant to the grant, was void, and the rights acquired under the grant were enforced against the grantor without regard to the exception or condition."

Shrewsbury & B. Ry. Co. v. London N. W. Ry. Co., 17 Q. B. 652; Id., 6 H. L. Cas. 115,—is a case which was so much discussed, and the point in which was held by the various courts considering the controversy to be so doubtful, that I cannot regard it as of any particular authority in the present suit.

The result of my consideration of the questions presented is that the condition which the Toledo & Ohio Railway Company is now asserting its right to enforce, and is threatening to enforce, is void, and the Columbus, Sandusky & Hocking Railroad Company is the tenant under the lease, by lawful assignment, and has the leasehold freed from the condition of item 16.

Shall the preliminary injunction issue? It does not admit of doubt that to cut the railroad operated by the receiver in two by the enforcement of the condition and the stopping of the joint use of the Columbus Branch would do irreparable injury to the defendant company, the Columbus, Sandusky & Hocking Railroad Company, and all persons interested therein. In such a case the remedy must be summary. Let the preliminary injunction go, as prayed, to continue in force till final hearing.